

LEXSEE 418 us 539

**WOLFF, WARDEN, ET AL. v. McDONNELL**

**No. 73-679**

**SUPREME COURT OF THE UNITED STATES**

*418 U.S. 539; 94 S. Ct. 2963; 41 L. Ed. 2d 935; 1974 U.S. LEXIS 91; 71 Ohio Op. 2d 336*

**April 22, 1974, Argued**

**June 26, 1974, Decided**

**PRIOR HISTORY:**

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

**DISPOSITION:**

*483 F.2d 1059,* affirmed in part, reversed in part, and remanded.

**SYLLABUS:**

Respondent, on behalf of himself and other inmates at a Nebraska prison, filed a complaint for damages and injunctive relief under *42 U. S. C. § 1983,* in which he alleged that disciplinary proceedings at the prison violated due process; that the inmate legal assistance program did not meet constitutional standards; and that the regulations governing inmates' mail were unconstitutionally restrictive. After an evidentiary hearing, the District Court granted partial relief. Though rejecting respondent's procedural due process claim, the court held that the prison's policy of inspecting all attorney-prisoner mail was improper but that restrictions on inmate legal assistance were not constitutionally defective. The Court of Appeals reversed with respect to the due process claim, holding that the procedural requirements outlined in the intervening decisions in *Morrissey v. Brewer, 408 U.S. 471,* and *Gagnon v. Scarpelli, 411 U.S. 778,* should be generally followed in prison disciplinary hearings, but leaving the specific requirements (including the circumstances in which counsel might be required) to be determined by the District Court on remand. The Court of Appeals further held that *Preiser v. Rodriguez, 411 U.S. 475,* forbade restoration of good-time credits in a § 1983 suit but ordered expunged from prison records misconduct determinations reached in proceedings that had not comported with due process. The court generally affirmed the District Court's judgment respecting correspondence with attorneys, but added some additional prescriptions and ordered further proceedings to determine whether the State was meeting its burden under *Johnson v. Avery, 393 U.S. 483,* to provide legal assistance to prisoners, a duty the court found to extend to civil rights cases as well as habeas corpus proceedings. Under Nebraska's disciplinary scheme forfeiture or withholding of good-time credits or confinement in a disciplinary cell is provided for serious misconduct and deprivation of privileges for less serious misconduct. To establish misconduct (1) a preliminary conference is held with the chief corrections supervisor and the charging party, where the prisoner is orally informed of the charge and preliminarily discusses the merits; (2) a conduct report is prepared and a hearing held before the prison's disciplinary body, the Adjustment Committee (composed of three prison officials), where (3) the inmate can ask questions of the charging party. *Held:*

1. Though the Court of Appeals correctly held that restoration of good-time credits under § 1983 is foreclosed under *Preiser, supra,* damages and declaratory and other relief for improper revocation of good-time credits are cognizable under that provision. Pp. 553-555.

2. A prisoner is not wholly stripped of constitutional protections, and though prison disciplinary proceedings do not implicate the full panoply of rights due a defendant in a criminal prosecution, such proceedings must be governed by a mutual accommodation between institutional needs and generally applicable constitutional requirements. Pp. 555-556.

3. Since prisoners in Nebraska can only lose good-time credits if they are guilty of serious misconduct, the procedure for determining whether such misconduct has occurred must observe certain minimal due process requirements (though not the full range of procedures mandated in *Morrissey, supra,* and *Scarpelli, supra,* for parole and probation revocation hearings) consonant with the unique institutional environment and therefore involving a more flexible approach reasonably accommodating the interests of the inmates and the needs of the institution. Pp. 556-572.

(a) Advance written notice of charges must be given to the disciplinary action inmate, no less than 24 hours before his appearance before the Adjustment Committee. Pp. 563-564.

(b) There must be "a written statement by the factfinders as to the evidence relied on and reasons for [the disciplinary action]." *Morrissey v. Brewer, supra,* at 489. Pp. 564-565.

(c) The inmate should be allowed to call witnesses and present documentary evidence in his defense if permitting him to do so will not jeopardize institutional safety or correctional goals. Pp. 566-567.

(d) The inmate has no constitutional right to confrontation and cross-examination in prison disciplinary proceedings, such procedures in the current environment, where prison disruption remains a serious concern, being discretionary with the prison officials. Pp. 567-569.

(e) Inmates have no right to retained or appointed counsel in such proceedings, although counsel substitutes should be

418 U.S. 539, *; 94 S. Ct. 2963, **;
41 L. Ed. 2d 935, ***; 1974 U.S. LEXIS 91

provided in certain cases. Pp. 569-570.

(f) On the record here it cannot be concluded that the Adjustment Committee is not sufficiently impartial to satisfy due process requirements. Pp. 570-571.

4. The Court of Appeals erred in holding that the due process requirements in prison disciplinary proceedings were to be applied retroactively by requiring the expunging of prison records of improper misconduct determinations. *Morrissey, supra, at 490.* Pp. 573-574.

5. The State may constitutionally require that mail from an attorney to a prisoner be identified as such and that his name and address appear on the communication; and -- as a protection against contraband -- that the authorities may open such mail in the inmate's presence. A lawyer desiring to correspond with a prisoner may also be required *first* to identify himself and his client to the prison officials to ensure that letters marked "privileged" are actually from members of the bar. Other restrictions on the attorney-prisoner mail procedure required by the courts below are disapproved. Pp. 574-577.

6. The District Court, as the Court of Appeals suggested, is to assess the adequacy of the legal assistance available for preparation of civil rights actions, applying the standard of *Johnson v. Avery, supra , at 490,* that "unless and until the State provides some reasonable alternative to assist inmates in the preparation of petitions for post-conviction relief," inmates could not be barred from furnishing assistance to each other. Pp. 577-580.

**COUNSEL:**
Melvin Kent Kammerlohr, Assistant Attorney General of Nebraska, argued the cause for petitioners. With him on the brief was Clarence A. H. Meyer, Attorney General.

Douglas F. Duchek, by appointment of the *Court, 415 U.S. 974,* argued the cause for respondent pro hac vice. With him on the briefs was Robert Plotkin.

Solicitor General Bork argued the cause for the United States as amicus curiae urging reversal. With him on the brief were Assistant Attorney General Petersen, Deputy Solicitor General Frey, Gerald P. Norton, and Jerome M. Feit. *

* Briefs of amici curiae urging reversal were filed by Evelle J. Younger, Attorney General, pro se, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, and W. Eric Collins, Harry A. Allen, April P. Kestell, and H. F. Wilkinson, Deputy Attorneys General, for the Attorney General of California, and by William J. Scott, Attorney General, and James B. Zagel, Assistant Attorney General, for the State of Illinois.

Briefs of amici curiae urging affirmance were filed by Chesterfield Smith and Robert J. Kutak for the American Bar Assn.; by David Gilman and Richard Singer for the National Council on Crime and Delinquency; by William E. Hellerstein and Joel Berger for the Legal Aid Society of New York; by Alvin J. Bronstein, Barbara M. Milstein, and Arpiar G. Saunders, Jr., for the National Prison Project; and by William H. Allen, Michael A. Schlanger, and David S.

Weissbrodt for the Inmates of the District of Columbia Correctional Complex.

**JUDGES:**
WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. MARSHALL, J., filed an opinion concurring in part and dissenting in part, in which BRENNAN, J., joined, post, p. 580. DOUGLAS, J., filed an opinion dissenting in part and concurring in the result in part, post, p. 593.

**OPINIONBY:**
WHITE

**OPINION:**

[*542] [***943] [**2968] MR. JUSTICE WHITE delivered the opinion of the Court.

[***HR1] We granted the petition for writ of certiorari in this case, *414 U.S. 1156 (1974),* because it raises important questions concerning the administration of a state prison.

[***HR2] Respondent, on behalf of himself and other inmates of the Nebraska Penal and Correctional Complex, Lincoln, Nebraska, filed a complaint under *42 U. S. C. § 1983* n1 challenging several of the practices, rules, and regulations of the Complex. For present purposes, the pertinent [*543] allegations were that disciplinary proceedings did not comply with the Due Process Clause of the Fourteenth Amendment to the Federal Constitution; that the inmate legal assistance program did not meet constitutional standards, and that the regulations governing the inspection of mail to and from attorneys for inmates were unconstitutionally restrictive. Respondent requested damages and injunctive relief.

n1 The practices, rules, and regulations of the Complex under challenge in this litigation are only in force at that institution, and are drafted by the Warden, and not by the Director of Correctional Services. Since no statewide regulation was involved there was no need to convene a three-judge court. See *Board of Regents v. New Left Education Project, 404 U.S. 541 (1972),*

After an evidentiary hearing, the District Court granted partial relief. *342 F.Supp. 616 (Neb. 1972).* Considering itself bound by prior Circuit authority, it rejected the procedural due process claim; but it went on to [***944] hold that the prison's policy of inspecting all incoming and outgoing mail to and from attorneys violated prisoners' rights of access to the courts and that the restrictions placed on inmate legal assistance were not constitutionally defective. n2

n2 The District Court also determined that contrary to state statutory provisions certain good time had been taken away for violations which were not

418 U.S. 539, *; 94 S. Ct. 2963, **;
41 L. Ed. 2d 935, ***; 1974 U.S. LEXIS 91

"flagrant or serious" within the meaning of the controlling state statute, see n. 5, *infra*, and ordered that good time be restored for all such offenses. The Court of Appeals affirmed the holding (though not the remedy, see *infra*, at 544). Petitioners do not challenge that holding in this Court.

Certain issues originally in contest in this litigation were settled by stipulation and order in the District Court. These concerned such matters as processing inmate letters to sentencing judges, the provision for postage to mail such letters, the adequacy of and access to the prison library, and the availability of a notary service. Others were decided by the District Court, after trial, and were not taken up on appeal to the Court of Appeals. These issues included the denial of use of typewriters to inmates, reprisals against inmates who petition the courts, the number of inmates who could use the prison library at one time, the length of time which could be spent in the library, delay in receiving mail, censorship of letters to the news media and public officials, and limitations on numbers of letters which can be written. None of these issues is raised here.

[*544] The Court of Appeals reversed, *483 F.2d 1059 (CA8 1973)*, with respect to [**2969] the due process claim, holding that the procedural requirements outlined by this Court in *Morrissey v. Brewer, 408 U.S. 471 (1972)*, and *Gagnon v. Scarpelli, 411 U.S. 778 (1973)*, decided after the District Court's opinion in this case, should be generally followed in prison disciplinary hearings but left the specific requirements, including the circumstances in which counsel might be required, to be determined by the District Court on remand. With respect to a remedy, the court further held that *Preiser v. Rodriguez, 411 U.S. 475 (1973)*, forbade the actual restoration of good-time credits in this § 1983 suit but ordered expunged from prison records any determinations of misconduct arrived at in proceedings that failed to comport with due process as defined by the court. The court generally affirmed the judgment of the District Court with respect to correspondence with attorneys, n3 but ordered further proceedings to determine whether the State was meeting its burden under *Johnson v. Avery, 393 U.S. 483 (1969)*, to provide legal assistance to prison inmates, the court holding that the State's duty extended to civil rights cases as well as to habeas corpus proceedings. n4

n3 No issues are raised here, nor were they in the Court of Appeals, as to the ruling in the District Court on restrictions on outgoing mail.

n4 The Court of Appeals found that the only person allowed to render legal assistance was the "Legal Advisor," and that the Warden did not allow prisoners to consult with other inmates. That finding, which disagreed to some extent with the District Court's, is not challenged by petitioners.

We begin with the due process claim. An understanding of the issues involved requires a detailing of the prison disciplinary regime set down by Nebraska statutes and prison regulations.

[*545] Section 16 of the Nebraska Treatment and Corrections Act, as amended, Neb. Rev. Stat. § 83-185 (Cum. Supp. 1972), n5 provides that the [***945] chief executive officer of each penal facility is responsible for the discipline of inmates [*546] in a particular institution. The statute provides for a range of possible disciplinary action. "Except in flagrant or serious cases, punishment for misconduct shall consist of deprivation of privileges. In cases of flagrant or serious misconduct, the chief executive officer may order that a person's reduction of term as provided in [**2970] section 83-1,107 [good-time credit n6 ] be [***946] forfeited or withheld and [*547] also that the person be confined in a disciplinary cell." Each breach of discipline is to be entered in the person's file together with the disposition or punishment therefor.

n5 That statutory provision provides, in full:

"(1) The chief executive officer of each facility shall be responsible for the discipline of those persons committed to the Division of Corrections who reside therein. No person shall be punished except upon the order of the chief executive officer of the facility; nor shall any punishment be imposed otherwise than in accordance with this section.

"(2) Except in flagrant or serious cases, punishment for misconduct shall consist of deprivation of privileges. In cases of flagrant or serious misconduct, the chief executive officer may order that a person's reduction of term as provided in section 83-1,107 be forfeited or withheld and also that the person be confined in a disciplinary cell. The chief executive officer may order that such person, during all or part of the period in a disciplinary cell, be put on an adequate and healthful diet. A person in a disciplinary cell shall be visited at least once every eight hours. No cruel, inhuman or corporal punishment shall be used on any person.

"(3) The chief executive officer shall maintain a record of breaches of discipline, of the disposition of each case, and of the punishment, if any, for each such breach. Each breach of discipline shall be entered in the person's file, together with the disposition or punishment therefor.

"(4) The chief executive officer may recommend to the Director of Corrections that a person who is considered to be incorrigible by reason of frequent intentional breaches of discipline, or who is detrimental to the discipline or the morale of the facility, be transferred to another facility for stricter safekeeping and closer confinement, subject to the provisions of section 83-176."

At the time this litigation was commenced, the statute gave examples of "flagrant or serious misconduct" -- "assault, escape, attempt to escape."

I

418 U.S. 539, *; 94 S. Ct. 2963, **;
41 L. Ed. 2d 935, ***; 1974 U.S. LEXIS 91

Neb. Rev. Stat. § 83-185 (1971). This was the definition employed by the District Court in deciding that certain offenses were not serious within the meaning of the Act. See n. 2, *supra.* The statutory change does not affect the issues in this litigation.

n6 Section 83-1,107, Neb. Rev. Stat. (Cum. Supp. 1972), which provides for the allowance and reduction of good time, states:

"(1) The chief executive officer of a facility shall reduce, for parole purposes, for good behavior and faithful performance of duties while confined in a facility the term of a committed offender as follows: Two months on the first year, two months on the second year, three months on the third year, four months for each succeeding year of his term and pro rata for any part thereof which is less than a year. In addition, for especially meritorious behavior or exceptional performance of his duties, an offender may receive a further reduction, for parole purposes, not to exceed five days, for any month of imprisonment. The total of all such reductions shall be deducted:

"(a) From his minimum term, to determine the date of his eligibility for release on parole; and

"(b) From his maximum term, to determine the date when his release on parole becomes mandatory under the provisions of section 83-1,111.

"(2) Reductions of such terms may be forfeited, withheld and restored by the chief executive officer of the facility after the offender has been consulted regarding the charges of misconduct. No reduction of an offender's term for especially meritorious behavior or exceptional performance of his duties shall be forfeited or withheld after an offender is released on parole.

"(3) Good time or other reductions of sentence granted under the provisions of any law prior to July 6, 1972 may be forfeited, withheld, or restored in accordance with the terms of this act."

Special provisions are set up by statute dealing with the transfer of minors. See Nebraska Treatment and Corrections Act § 7, as amended by LB57, Session Laws 1973, § 1, Neb. Rev. Stat. § 83-176 (Supp. 1973).

Certain changes made in § 83-1,107, between time suit was brought and now, as related in the prior version of the provision, Neb. Rev. Stat. § 83-1,107 (1971), are not important to the issues in dispute here.

Determinations of loss of good time are directly relevant to receiving parole. Under Neb. Rev. Stat. § 83-1,109 (1971), all reductions are to be reported to and considered by parole authorities.

By prison regulation, prisoners may also earn "blood time." The pertinent regulation provides:

"Anyone who donates blood to the American Red Cross receives good time credits for their donations.

Anyone under the age of 18 must have the Warden's approval. Those over 18 may voluntarily give blood on the following scheduled months: MAY, AUGUST and DECEMBER. The Red Cross Bloodmobile unit is generally scheduled for the first full week of the months mentioned above.

"You will reduce from your sentence, via the Board of Parole approval, five days for the first donation, ten days for the second donation, and fifteen days for every donation thereafter.

"Should you receive a disciplinary report or below average work report any time between donations, you will be credited only five days the next time you donate blood to the Red Cross as a result of the disciplinary action."

Since "blood time" operates like good time to reduce the term of sentence, and since it represents only an additional way to accumulate good time, it is considered to be included within the meaning of that term.

As the statute makes clear, there are basically two kinds of punishment for flagrant or serious misconduct. The first is the forfeiture or withholding of good-time credits, which affects the term of confinement, while the second, confinement in a disciplinary cell, involves alteration of the conditions of confinement. If the misconduct is less than flagrant or serious, only deprivation of privileges results. n7

n7 The record does not disclose what specific sanctions are employed at the Complex under the general heading of "deprivation of privileges."

[*548]    The only statutory provision establishing procedures for the imposition of disciplinary sanctions which pertains to good time, § 38 of the Nebraska Treatment and Corrections Act, as amended, Neb. Rev. Stat. § 83-1,107 (Cum. Supp. 1972), merely requires that an inmate be "consulted regarding the charges of misconduct" in connection with the forfeiture, withholding, or restoration of credit. But prison authorities have framed written regulations dealing with procedures and policies for controlling inmate misconduct. n8 [**2972] By regulation, [***947] misconduct is [*549] classified into two categories: major misconduct is a "serious violation" and must be formally reported to an Adjustment [***948] Committee, composed of the Associate Warden [*550] Custody, the Correctional Industries Superintendent, and the Reception Center Director. This Committee is directed to "review and evaluate all misconduct reports" [*551] and, among other things, to "conduct investigations, make findings, [and] impose disciplinary actions." If only minor misconduct, "a less serious violation," is involved, [*552] the problem may either be resolved informally by the inmate's supervisor or it can be formally reported for action to the Adjustment Committee. Repeated minor misconduct must be reported. The Adjustment

418 U.S. 539, *; 94 S. Ct. 2963, **;
41 L. Ed. 2d 935, ***; 1974 U.S. LEXIS 91

Committee has available a wide range of sanctions. "Disciplinary action taken and recommended may include but not necessarily be limited to the following: reprimand, restrictions of various kinds, extra duty, confinement in the Adjustment Center [the disciplinary cell], withholding of statutory good time and/or extra earned good time, or a combination of the elements listed herein." n9

n8 The regulations, in full, are:

"*Policy*: In the interest of treatment-oriented discipline, it is necessary that inmates and staff members maintain high standards of behavior, courtesy and personal conduct. It is the policy of this institution, in administering discipline, to gain voluntary acceptance of certain limitations by the inmate body. Discipline must be realistically administered in order to maintain the general welfare of the institution community and conformance to specified standards and regulations, while at the same time implementing treatment of the offender.

"*Purpose*: To set forth the institutional policy and procedures for the administration of discipline to insure that disciplinary processes are carried out as an integral part of the total treatment program, and to establish professional standards for all employees in fulfilling this responsibility.

"*Standards of Conduct*. The institution population will be kept informed through the orientation process and by written orders and memorandums as to the standards of conduct expected. When it becomes necessary to regulate and control a man's conformance to the prescribed standards, disciplinary measures consistent with treatment of the individual will be applied in appropriate degree and in an impersonal, impartial manner.

"*Misconduct*.

"a. Major Misconduct: Major misconduct is a serious violation and will be reported formally to the Adjustment Committee on the Misconduct Report Form and/or detailed narrative.

"b. Minor Misconduct: Minor misconduct is a less serious violation which may be resolved immediately and informally by the inmate's supervisor or formally reported on the Misconduct Report Form. Repeated minor misconduct should be formally reported.

"*Misconduct Reports*:

"a. Preparation: In reporting misconduct on the Misconduct Report Form, the report should be prepared carefully and accurately so as to describe events exactly as they happen. The accurate preparation of a Misconduct Report is a major contributing factor in accurate evaluation of the misconduct by the Adjustment Committee. The initial statement on the report should be a brief statement of the charge or charges, followed by a detailed report of the incident. Articles of evidence should always accompany the report.

"b. Processing of Misconduct Reports: Completed Misconduct Reports along with any articles of evidence, should be forwarded to the Chief Correction Supervisor's office for investigation. The Shift Lieutenant will conduct an investigation, note his findings, and submit to the Chief Corrections Supervisor. The Chief Corrections Supervisor will review the report, conduct additional investigation if necessary, interview the Shift Lieutenant and officer submitting report, and verify the accuracy, proper preparation of the report and assemble all information and articles regarding the misconduct report. Upon completion of this investigation, all information will be noted on the space provided on the Misconduct Report, then submitted to the Chairman of the Adjustment Committee so the case may be promptly scheduled for a committee hearing.

"*Administration of Discipline*: The administration of discipline is hereby delegated as follows:

"a. All employees will resolve immediately and informally minor violations by any inmate under their observation and/or supervision.

"b. The Chief Corrections Supervisor will initiate prompt investigation on all misconduct reports and will maintain control of any adverse situation and its inmate participants.

"c. Adjustment Committee will receive reports of misconduct, conduct hearings, and make findings and impose disciplinary actions.

"*The Adjustment Committee*:

"a. Organization: The Adjustment Committee is composed as follows: Associate Warden Custody, Chairman; Correctional Industries Superintendent, Member; Reception Center Director, Member.

"Note: The Adjustment Committee is responsible for the preparation of meeting agenda, recording, distribution, and filing of all reports as necessary for institution requirements. Further, the committee will answer directly to the Administrative Assistant on matters of discipline, adjustment, and investigations conducted relative to the daily processing of Misconduct Reports.

"b. Committee Functions:

"(1) The Adjustment Committee will meet daily at 8:00 a. m. in the office of the Associate Warden Custody and/or the Adjustment Center, as required.

"(2) The Committee will review and evaluate all misconduct reports as to the underlying causes for the adverse behavior and will carefully consider all possible courses of action before reaching a decision.

418 U.S. 539, *; 94 S. Ct. 2963, **;
41 L. Ed. 2d 935, ***; 1974 U.S. LEXIS 91

on the inmates by the officers of the Complex daily;

[*553] "(b) the convict is called to a conference with the chief correction supervisor and the charging party;

"(c) following the conference, a conduct report is sent to the Adjustment Committee;

"(d) there follows a hearing before the Adjustment Committee and the report is read to the inmate and discussed;

"(e) if the inmate denies charge he may ask questions of the party writing him up;

"(f) the Adjustment Committee can conduct additional investigations if it desires;

"(g) punishment is imposed."

n10 The Warden testified that a great number of cases are resolved without contest, and that in many instances the inmate admits his guilt to the investigating officer.

II

This class action brought by respondent alleged that the rules, practices, and procedures at the Complex which might result in the taking of good time violated the Due Process Clause of the Fourteenth Amendment. Respondent sought three types of relief: (1) restoration of good time; (2) submission of a plan by the prison authorities for a hearing procedure in connection with withholding and forfeiture of good time which complied with the requirements of due process; and (3) damages for the deprivation of civil rights resulting from the use of the allegedly unconstitutional procedures. n11

n11 The prayer of the amended complaint asked the court to "[adjudicate] that under the rules, practices and procedures at the Complex the taking of statutory prisoner good time from the inmates constitutes an increase in the inmates' sentence without due process of law in violation of Amendment XIV ...." It asked the court to "order the defendants to restore to the plaintiff Robert O. McDonnell that amount of good time taken" from him, and to "[order] defendants to submit a plan" which provided "[for] a hearing procedure in connection with withholding and forfeiture of good time which complies with the requirements of due process ...." It further sought damages in the sum of $ 75,000 for the deprivation of the various constitutional rights involved in litigation, necessarily including the right to due process.

[*554]

[***HR3] At the threshold is the issue whether under *Preiser*

*v. Rodriguez, 411 U.S. 475 (1973)*, the validity of the procedures for depriving prisoners of good-time credits may be considered in a civil rights suit brought under *42 U. S. C. § 1983*. In *Preiser*, state prisoners brought a § 1983 suit seeking an injunction to compel restoration of good-time credits. The Court held that because the state prisoners were challenging the very fact or duration of their confinement and were seeking a speedier release, their sole federal remedy was by writ of habeas corpus, *411 U.S., at 500*, with the concomitant requirement of exhausting state remedies. But the Court was careful to point out that habeas corpus is not an appropriate [***950] or available remedy for damages claims, which, if not frivolous and of sufficient substance to invoke the jurisdiction of the federal court, could be pressed under § 1983 along with suits challenging the conditions of confinement rather than the fact or length of custody. *411 U.S., at 494, 498-499.*

[**2974] The complaint in this case sought restoration of good-time credits, and the Court of Appeals correctly held this relief foreclosed under *Preiser*. But the complaint also sought damages; and *Preiser* expressly contemplated that claims properly brought under § 1983 could go forward while actual restoration of good-time credits is sought in state proceedings. *411 U.S., at 499 n. 14.* n12 Respondent's damages claim was therefore properly before the District Court and required determination of the validity of the procedures employed for imposing sanctions, including loss of good time, for flagrant or serious misconduct. [*555] Such a declaratory judgment as a predicate to a damages award would not be barred by *Preiser*; and because under that case only an injunction restoring good time improperly taken is foreclosed, neither would it preclude a litigant with standing from obtaining by way of ancillary relief an otherwise proper injunction enjoining the prospective enforcement of invalid prison regulations.

n12 One would anticipate that normal principles of *res judicata* would apply in such circumstances.

We therefore conclude that it was proper for the Court of Appeals and the District Court to determine the validity of the procedures for revoking good-time credits and to fashion appropriate remedies for any constitutional violations ascertained, short of ordering the actual restoration of good time already canceled. n13

n13 It is suggested that the Court of Appeals wholly excluded the matter of good time from the proceedings on remand. It is true that the court's opinion is arguably ambiguous; but as we understand it, the District Court on remand was to determine the validity of the procedures for disciplinary hearings that may result in serious penalties, including good time, and that appropriate remedies were to be fashioned short of actual restoration of good time.

III

418 U.S. 539, *; 94 S. Ct. 2963, **;
41 L. Ed. 2d 935, ***; 1974 U.S. LEXIS 91

[***HR4] [***HR5] [***HR6] [***HR7] [***HR8] Petitioners assert that the procedure for disciplining prison inmates for serious misconduct is a matter of policy raising no constitutional issue. If the position implies that prisoners in state institutions are wholly without the protections of the Constitution and the Due Process Clause, it is plainly untenable. Lawful imprisonment necessarily makes unavailable many rights and privileges of the ordinary citizen, a "retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285 (1948). But though his rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime. There is no iron curtain [*556] drawn between the Constitution and the prisons of this country. Prisoners have been held to enjoy substantial religious freedom under the First and Fourteenth Amendments. *Cruz v. Beto*, 405 U.S. 319 (1972); *Cooper v. Pate*, 378 U.S. 546 (1964). They retain right of [***951] access to the courts. *Younger v. Gilmore*, 404 U.S. 15 (1971), aff'g *Gilmore v. Lynch*, 319 F.Supp. 105 (ND Cal. 1970); *Johnson v. Avery*, 393 U.S. 483 (1969); *Ex parte Hull*, 312 U.S. 546 (1941). Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race. *Lee v. Washington*, 390 U.S. 333 (1968). Prisoners may also claim the protections of the Due Process Clause. They may not be deprived of life, liberty, or property without due process of law. *Haines v. Kerner*, 404 U.S. 519 (1972); *Wilwording v. Swenson*, 404 U.S. 249 (1971); *Screws v. United States*, 325 U.S. 91 (1945).

[**2975]

[***HR9] Of course, as we have indicated, the fact that prisoners retain rights under the Due Process Clause in no way implies that these rights are not subject to restrictions imposed by the nature of the regime to which they have been lawfully committed. Cf. *CSC v. Letter Carriers*, 413 U.S. 548 (1973); *Broadrick v. Oklahoma*, 413 U.S. 601 (1973); *Parker v. Levy*, 417 U.S. 733 (1974). (Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply.) Cf. *Morrissey v. Brewer*, 408 U.S., at 488. In sum, there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application.

[***HR10] [***HR11] We also reject the assertion of the State that whatever may be true of the Due Process Clause in general or of other rights protected by that Clause against state infringement, the interest of prisoners in disciplinary procedures [*557] is not included in that "liberty" protected by the Fourteenth Amendment. It is true that the Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison. But here the State itself has not only provided a statutory right to good time but also specifies that it is to be forfeited only for serious misbehavior. Nebraska may have the authority to create, or not, a right to a shortened prison sentence through the accumulation of credits for good behavior, and it is true that the Due Process Clause does not require a hearing "in every conceivable case of government impairment of private interest." *Cafeteria Workers v. McElroy*, 367 U.S. 886, 894 (1961). But the State having created the right to good

time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment "liberty" to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated. This is the thrust of recent cases in the prison disciplinary context. In *Haines v. Kerner*, *supra*, the state prisoner asserted a "denial of due process in the steps leading to [disciplinary] confinement." 404 U.S. at 520. We reversed the dismissal of the § 1983 complaint for failure to state a claim. In *Preiser v. Rodriguez*, *supra*, the prisoner complained that he had been deprived [***952] of good-time credits without notice or hearing and without due process of law. We considered the claim a proper subject for a federal habeas corpus proceeding.

[***HR12] This analysis as to liberty parallels the accepted due process analysis as to property. The Court has consistently held that some kind of hearing is required at some time before a person is finally deprived of his property [*558] interests. *Anti-Fascist Committee v. McGrath*, 341 U.S. 123, 168 (1951) (Frankfurter, J., concurring). The requirement for some kind of a hearing applies to the taking of private property, *Grannis v. Ordean*, 234 U.S. 385 (1914), the revocation of licenses, *In re Ruffalo*, 390 U.S. 544 (1968), the operation of state dispute-settlement mechanisms, when one person seeks to take property from another, or to government-created jobs held, absent "cause" for termination, *Board of Regents v. Roth*, 408 U.S. 564 (1972); *Arnett v. Kennedy*, 416 U.S. 134, 164 (1974) (POWELL, J., concurring); *id.*, at 171 (WHITE, J., concurring in part and dissenting in part); *id.*, at 206 (MARSHALL, J., dissenting). Cf. *Stanley v. Illinois*, 405 U.S. 645, 652-654 [**2976] (1972); *Bell v. Burson*, 402 U.S. 535 (1971).

[***HR13] [***HR14] [***HR15] We think a person's liberty is equally protected, even when the liberty itself is a statutory creation of the State. (The touchstone of due process is protection of the individual against arbitrary action of government,) *Dent v. West Virginia*, 129 U.S. 114, 123 (1889). Since prisoners in Nebraska can only lose good-time credits if they are guilty of serious misconduct, the determination of whether such behavior has occurred becomes critical, and the minimum requirements of procedural due process appropriate for the circumstances must be observed.

IV

As found by the District Court, the procedures employed are: (1) a preliminary conference with the Chief Corrections Supervisor and the charging party, where the prisoner is informed of the misconduct charge and engages in preliminary discussion on its merits; (2) the preparation of a conduct report and a hearing held before the Adjustment Committee, the disciplinary body of the prison, where the report is read to the inmate; and [*559] (3) the opportunity at the hearing to ask questions of the charging party. The State contends that the procedures already provided are adequate. The Court of Appeals held them insufficient and ordered that the due process requirements outlined in *Morrissey* and *Scarpelli* be satisfied in serious disciplinary cases at the prison.

*Morrissey* held that due process imposed certain minimum

418 U.S. 539, *; 94 S. Ct. 2963, **;
41 L. Ed. 2d 935, ***; 1974 U.S. LEXIS 91

procedural requirements which must be satisfied before parole could finally be revoked. These procedures were:

"(a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a [***953] 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole." 408 U.S., at 489.

The Court did not reach the question as to whether the parolee is entitled to the assistance of retained counsel or to appointed counsel, if he is indigent. Following the decision in Morrissey, in Gagnon v. Scarpelli, 411 U.S. 778 (1973), the Court held the requirements of due process established for parole revocation were applicable to probation revocation proceedings. The Court added to the required minimum procedures of Morrissey the right to counsel, where a probationer makes a request, "based on a timely and colorable claim (i) that he has not committed the alleged violation of the conditions upon which he is at liberty; or (ii) that, even if the violation [*560] is a matter of public record or is uncontested, there are substantial reasons which justified or mitigated the violation and make revocation inappropriate, and that the reasons are complex or otherwise difficult to develop or present." Id., at 790. In doubtful cases, the agency was to consider whether the probationer appeared to be capable of speaking effectively for himself, id., at 790-791, and a record was to be made of the grounds for refusing to appoint counsel.

We agree with neither petitioners nor the Court of Appeals: the Nebraska procedures are in some respects constitutionally deficient but the Morrissey-Scarpelli procedures need not in all respects be followed in disciplinary cases in state prisons.

[**2977]

[***HR16] [***HR17] We have often repeated that "[the] very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." Cafeteria Workers v. McElroy, 367 U.S., at 895. "[Consideration] of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." Ibid.; Morrissey, 408 U.S., at 481. Viewed in this light it is immediately apparent that one cannot automatically apply procedural rules designed for free citizens in an open society, or for parolees or probationers under only limited restraints, to the very different situation presented by a disciplinary proceeding in a state prison.

Revocation of parole may deprive the parolee of only conditional liberty, but it nevertheless "inflicts a 'grievous loss' on the parolee and often on others." Id., at 482. Simply put, revocation proceedings determine whether the parolee will be free or in prison, a matter of obvious great moment to him. For the prison inmate, [*561] the deprivation of good time is not the same immediate disaster that the revocation of parole is for the parolee. The deprivation, very likely, does not then and there work any change in the conditions of his liberty. It can postpone the date of eligibility for parole and extend the maximum term to be served, but it is not certain to do so, for good time may be restored. Even if not restored, it cannot be said with certainty that the actual date of parole [***954] will be affected; and if parole occurs, the extension of the maximum term resulting from loss of good time may affect only the termination of parole, and it may not even do that. The deprivation of good time is unquestionably a matter of considerable importance. The State reserves it as a sanction for serious misconduct, and we should not unrealistically discount its significance. But it is qualitatively and quantitatively different from the revocation of parole or probation.

In striking the balance that the Due Process Clause demands, however, we think the major consideration militating against adopting the full range of procedures suggested by Morrissey for alleged parole violators is the very different stake the State has in the structure and content of the prison disciplinary hearing. That the revocation of parole be justified and based on an accurate assessment of the facts is a critical matter to the State as well as the parolee; but the procedures by which it is determined whether the conditions of parole have been breached do not themselves threaten other important state interests, parole officers, the police, or witnesses -- at least no more so than in the case of the ordinary criminal trial. Prison disciplinary proceedings, on the other hand, take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so. Some are first offenders, but many are recidivists who [*562] have repeatedly employed illegal and often very violent means to attain their ends. They may have little regard for the safety of others or their property or for the rules designed to provide an orderly and reasonably safe prison life. Although there are very many varieties of prisons with different degrees of security, we must realize that in many of them the inmates are closely supervised and their activities controlled around the clock. Guards and inmates co-exist in direct and intimate contact. Tension between them is unremitting. Frustration, resentment, and despair are commonplace. Relationships among the inmates are varied and complex and perhaps subject to the unwritten code that exhorts inmates not to inform on a fellow prisoner.

It is against this background that disciplinary proceedings must be structured [**2978] by prison authorities; and it is against this background that we must make our constitutional judgments, realizing that we are dealing with the maximum security institution as well as those where security considerations are not paramount. The reality is that disciplinary hearings and the imposition of disagreeable sanctions necessarily involve confrontations between inmates and authority and between inmates who are being disciplined and those who would charge or furnish evidence against them. Retaliation is much more than a theoretical possibility; and the basic and unavoidable task of providing reasonable personal safety for guards and inmates may be at stake, to say nothing of the impact of disciplinary confrontations and the resulting escalation of personal antagonisms on the important aims of the correctional process.

418 U.S. 539, *; 94 S. Ct. 2963, **;
41 L. Ed. 2d 935, ***; 1974 U.S. LEXIS 91

Indeed, it is pressed upon us that the proceedings to ascertain and sanction misconduct themselves play a major role in furthering the institutional goal of modifying the behavior and value systems of prison inmates [*563] sufficiently to permit [***955] them to live within the law when they are released. Inevitably there is a great range of personality and character among those who have transgressed the criminal law. Some are more amenable to suggestion and persuasion than others. Some may be incorrigible and would merely disrupt and exploit the disciplinary process for their own ends. With some, rehabilitation may be best achieved by simulating procedures of a free society to the maximum possible extent; but with others, it may be essential that discipline be swift and sure. n14 In any event, it is argued, there would be great unwisdom in encasing the disciplinary procedures in an inflexible constitutional straitjacket that would necessarily call for adversary proceedings typical of the criminal trial, very likely raise the level of confrontation between staff and inmate, and make more difficult the utilization of the disciplinary process as a tool to advance the rehabilitative goals of the institution. This consideration, along with the necessity to maintain an acceptable level of personal security in the institution, must be taken into account as we now examine in more detail the Nebraska procedures that the Court of Appeals found wanting.

n14 See generally A. Bandura, Principles of Behavior Modification (1969); L. Krasner & L. Ullmann, Research in Behavior Modification (1965); B. Skinner, Science and Human Behavior (1953).

V

[***HR18]   [***HR19]   Two of the procedures that the Court held should be extended to parolees facing revocation proceedings are not, but must be, provided to prisoners in the Nebraska Complex if the minimum requirements of procedural due process are to be satisfied. These are adequate written notice of the claimed violation and a written statement of the factfinders as to the evidence relied upon and the reasons for the disciplinary action taken. As described [*564] by the Warden in his oral testimony, on the basis of which the District Court made its findings, the inmate is now given oral notice of the charges against him at least as soon as the conference with the Chief Corrections Supervisor and charging party. A written record is there compiled and the report read to the inmate at the hearing before the Adjustment Committee where the charges are discussed and pursued. There is no indication that the inmate is ever given a written statement by the Committee as to the evidence or informed in writing or otherwise as to the reasons for the disciplinary action taken.

[***HR20]   [***HR21]   Part of the function of notice is to give the charged party a chance to marshal the facts in his defense and to clarify what the charges are, in fact. See In re Gault, 387 U.S. 1, 33-34, and n. 54 (1967). Neither of these functions was performed by the notice described by the [**2979] Warden. Although the charges are discussed orally with the inmate somewhat in advance of the hearing, the inmate

is sometimes brought before the Adjustment Committee shortly after he is orally informed of the charges. Other times, after this initial discussion, further investigation takes place which may reshape the nature of the charges or the evidence relied upon. In those instances, under procedures in effect at the time of trial, it would appear that the inmate first receives notice of the actual charges at the time of the [***956] hearing before the Adjustment Committee. We hold that written notice of the charges must be given to the disciplinary-action defendant in order to inform him of the charges and to enable him to marshal the facts and prepare a defense. At least a brief period of time after the notice, no less than 24 hours, should be allowed to the inmate to prepare for the appearance before the Adjustment Committee.

We also hold that there must be a "written statement by the factfinders as to the evidence relied on and reasons" for the disciplinary action. Morrissey, 408 U.S., at [*565] 489. Although Nebraska does not seem to provide administrative review of the action taken by the Adjustment Committee, the actions taken at such proceedings may involve review by other bodies. They might furnish the basis of a decision by the Director of Corrections to transfer an inmate to another institution because he is considered "to be incorrigible by reason of frequent intentional breaches of discipline," Neb. Rev. Stat. § 83-185 (4) (Cum. Supp. 1972), and are certainly likely to be considered by the state parole authorities in making parole decisions. n15 Written records of proceedings will thus protect the inmate against collateral consequences based on a misunderstanding of the nature of the original proceeding. Further, as to the disciplinary action itself, the provision for a written record helps to insure that administrators, faced with possible scrutiny by state officials and the public, and perhaps even the courts, where fundamental constitutional rights may have been abridged, will act fairly. Without written records, the inmate will be at a severe disadvantage in propounding his own cause to or defending himself from others. It may be that there will be occasions when personal or institutional safety is so implicated that the statement may properly exclude certain items of evidence, but in that event the statement should indicate the fact of the omission. Otherwise, we perceive no conceivable rehabilitative objective or prospect of prison disruption that can flow from the requirement of these statements. n16

n15 See n. 8, supra.

n16 A Survey of Prison Disciplinary Practices and Procedures of the American Bar Association's Commission on Correctional Facilities and Services (1974), reveals that 98% of the 49 prison systems of the States and the United States answering the questionnaire provided written notice of the charges to an inmate. The Survey shows that 91% of the systems, out of 34 responses, make a record of the hearings.

[*566]

[***HR22]   [***HR23]   We are also of the opinion that the

418 U.S. 539, *; 94 S. Ct. 2963, **;
41 L. Ed. 2d 935, ***; 1974 U.S. LEXIS 91

inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals. Ordinarily, the right to present evidence is basic to a fair hearing; but the unrestricted right to call witnesses from the prison population carries obvious potential for disruption and for interference with the swift punishment that in individual cases may be essential to carrying out the correctional program of the institution. We should not be too ready to exercise oversight and put aside the judgment of prison administrators. It may be that an individual threatened with serious [***957] sanctions would normally be entitled to present witnesses and relevant documentary evidence; but here we must balance [**2980] the inmate's interest in avoiding loss of good time against the needs of the prison, and some amount of flexibility and accommodation is required. Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence. Although we do not prescribe it, it would be useful for the Committee to state its reason for refusing to call a witness, whether it be for irrelevance, lack of necessity, or the hazards presented in individual cases. Any less flexible rule appears untenable as a constitutional matter, at least on the record made in this case. The operation of a correctional institution is at best an extraordinarily difficult undertaking. Many prison officials, on the spot and with the responsibility for the safety of inmates and staff, are reluctant to extend the unqualified right to call witnesses; and in our view, they must have the necessary discretion without being subject to unduly crippling constitutional [*567] impediments. There is thus much play in the joints of the Due Process Clause, and we stop short of imposing a more demanding rule with respect to witnesses and documents.

[***HR24]    [***HR25]   Confrontation and cross-examination present greater hazards to institutional interests. n17 If confrontation and cross-examination of those furnishing evidence against the inmate were to be allowed as a matter of course, as in criminal trials, there would be considerable potential for havoc inside the prison walls. Proceedings would inevitably be longer and tend to unmanageability. These procedures are essential in criminal trials where the accused, if found guilty, may be subjected to the most serious deprivations, *Pointer v. Texas, 380 U.S. 400 (1965),* or where a person may lose his job in society, *Greene v. McElroy, 360 U.S. 474, 496-497 (1959).* But they are not rights universally applicable to all hearings. See *Arnett v. Kennedy, 416 U.S. 134 (1974).* Rules of procedure may be shaped by consideration of the risks of error, *In re Winship, 397 U.S. 358, 368 (1970)* (Harlan, J., concurring); *Arnett v. Kennedy, supra, p. 171* (WHITE, J., concurring in part and dissenting in part), and should also be shaped by the consequences which will follow their adoption. Although some States do seem to allow cross-examination in disciplinary hearings, n18 we are not apprised of the conditions under which [*568] the procedure may be curtailed; and it does not appear that confrontation and cross-examination are generally [***958] required in this context. We think that the Constitution should not be read to impose the procedure at the present time and that adequate bases for decision in prison

disciplinary cases can be arrived at without cross-examination.

n17 We note that though Nebraska does not as a general matter allow cross-examination of adverse witnesses at the hearing before the Adjustment Committee, the inmate is allowed to ask the charging party questions about the nature of the charges. He is also allowed to speak freely in his own defense.

n18 The Survey, see n. 16, *supra,* discloses that cross-examination of witnesses is "allowed" in 28 States, 57% of the 49 systems responding, but the Survey also discloses, that even in these 28 States -- the federal system does not allow cross-examination -- certain limitations are placed on the use of the procedure. *Id.,* at 19-20.

Perhaps as the problems of penal institutions change and correctional goals are reshaped, the balance of interests involved will require otherwise. But in the current environment, where prison disruption remains a serious concern to administrators, we cannot ignore the desire and effort of many States, including Nebraska, and the Federal Government to avoid situations that may trigger deep emotions and that may scuttle the disciplinary process as a rehabilitation vehicle. To some extent, the American [**2981] adversary trial presumes contestants who are able to cope with the pressures and aftermath of the battle, and such may not generally be the case of those in the prisons of this country. At least, the Constitution, as we interpret it today, does not require the contrary assumption. Within the limits set forth in this opinion we are content for now to leave the continuing development of measures to review adverse actions affecting inmates to the sound discretion of corrections officials administering the scope of such inquiries.

We recognize that the problems of potential disruption may differ depending on whom the inmate proposes to cross-examine. If he proposes to examine an unknown fellow inmate, the danger may be the greatest, since the disclosure of the identity of the accuser, and the cross-examination which will follow, may pose a high risk of reprisal within the institution. Conversely, the inmate accuser, who might freely tell his story privately to prison officials, may refuse to testify or admit any knowledge of the situation in question. Although the dangers posed by [*569] cross-examination of known inmate accusers, or guards, may be less, the resentment which may persist after confrontation may still be substantial. Also, even where the accuser or adverse witness is known, the disclosure of third parties may pose a problem. There may be a class of cases where the facts are closely disputed, and the character of the parties minimizes the dangers involved. However, any constitutional rule tailored to meet these situations would undoubtedly produce great litigation and attendant costs in a much wider range of cases. Further, in the last analysis, even within the narrow range of cases where interest balancing may well dictate cross-examination, courts will be faced with the assessment of prison officials as to the dangers involved, and there would be a limited basis for upsetting such judgments. The better course at this time, in a period where prison

practices are diverse and somewhat experimental, is to leave these matters to the sound discretion of the officials of state prisons.

As to the right to counsel, the problem as outlined in *Scarpelli* with respect to parole and probation revocation proceedings is even more pertinent here:

"The introduction of counsel into a revocation proceeding will alter significantly the nature of the proceeding. If counsel is provided for the probationer or parolee, the State in turn will normally provide its own counsel; lawyers, by training and disposition, are advocates and bound by professional duty to present all available evidence and arguments in support [***959] of their clients' positions and to contest with vigor all adverse evidence and views. The role of the hearing body itself, aptly described in *Morrissey* as being 'predictive and discretionary' as well as factfinding, may become more akin to that of a judge at a trial, and less attuned to the rehabilitative [*570] needs of the individual probationer or parolee. In the greater self-consciousness of its quasi-judicial role, the hearing body may be less tolerant of marginal deviant behavior and feel more pressure to reincarcerate than to continue nonpunitive rehabilitation. Certainly, the decisionmaking process will be prolonged, and the financial cost to the State -- for appointed counsel, counsel for the State, a longer record, and the possibility of judicial review -- will not be insubstantial." *411 U.S., at 787-788* (footnote omitted).

[***HR26]  The insertion of counsel into the disciplinary process would inevitably give the proceedings a more adversary cast and tend to reduce their utility as a means to further correctional goals. There would also be delay and very practical problems in providing counsel in sufficient numbers at the time and place where hearings are to be held. At this stage of the development of these procedures we are not prepared to hold that inmates have a right to either retained or appointed counsel in disciplinary proceedings.

[**2982]  Where an illiterate inmate is involved, however, or where the complexity of the issue makes it unlikely that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case, he should be free to seek the aid of a fellow inmate, or if that is forbidden, to have adequate substitute aid in the form of help from the staff or from a sufficiently competent inmate designated by the staff. We need not pursue the matter further here, however, for there is no claim that respondent, McDonnell, is within the class of inmates entitled to advice or help from others in the course of a prison disciplinary hearing.

[***HR27]  Finally, we decline to rule that the Adjustment Committee which conducts the required hearings at the Nebraska [*571] Prison Complex and determines whether to revoke good time is not sufficiently impartial to satisfy the Due Process Clause. The Committee is made up of the Associate Warden Custody as chairman, the Correctional Industries Superintendent, and the Reception Center Director. The Chief Corrections Supervisor refers cases to the Committee after investigation and an initial interview with the inmate involved. The Committee is not left at large with unlimited discretion. It is directed to meet daily and to operate within the principles

stated in the controlling regulations, among which is the command that "[full] consideration must be given to the causes for the adverse behavior, the setting and circumstances in which it occurred, the man's accountability, and the correctional treatment goals," as well as the direction that "disciplinary measures will be taken only at such times and to such degrees as are necessary to regulate and control a man's behavior within acceptable limits and will never be rendered capriciously or in the nature of retaliation or revenge." We find no warrant in the record presented here for concluding that the Adjustment Committee presents such a hazard of [***960] arbitrary decisionmaking that it should be held violative of due process of law.

[***HR28]  Our conclusion that some, but not all, of the procedures specified in *Morrissey* and *Scarpelli* must accompany the deprivation of good time by state prison authorities n19 is [*572] not graven in stone. As the nature of the prison disciplinary process changes in future years, circumstances may then exist which will require further consideration and reflection of this Court. It is our view, however, that the procedures we have now required in prison disciplinary proceedings represent a reasonable accommodation between the interests of the inmates and the needs of the institution. n20

n19 Although the complaint put at issue the procedures employed with respect to the deprivation of good time, under the Nebraska system, the same procedures are employed where disciplinary confinement is imposed. The deprivation of good time and imposition of "solitary" confinement are reserved for instances where serious misbehavior has occurred. This appears a realistic approach, for it would be difficult for the purposes of procedural due process to distinguish between the procedures that are required where good time is forfeited and those that must be extended when solitary confinement is at issue. The latter represents a major change in the conditions of confinement and is normally imposed only when it is claimed and proved that there has been a major act of misconduct. Here, as in the case of good time, there should be minimum procedural safeguards as a hedge against arbitrary determination of the factual predicate for imposition of the sanction. We do not suggest, however, that the procedures required by today's decision for the deprivation of good time would also be required for the imposition of lesser penalties such as the loss of privileges.

n20 The Courts of Appeals, which have ruled on procedures required in prison disciplinary proceedings, have been split. Two Circuits have required written notice in advance, *Clutchette v. Procunier, 497 F.2d 809 (CA9 1974); United States ex rel. Miller v. Twomey, 479 F.2d 701 (CA7 1973)*, while two have held that oral notice is sufficient, *Meyers v. Alldredge, 492 F.2d 296 (CA3 1974); Braxton v. Carlson, 483 F.2d 933 (CA3 1973); Sostre v. McGinnis, 442 F.2d 178 (CA2 1971)* (en banc), cert. denied *sub nom. Oswald v. Sostre, 405 U.S. 978 (1972)*. The Ninth Circuit, *Clutchette v. Procunier, supra,* has held that a