418 U.S. 539, *; 94 S. Ct. 2963, **;
41 L. Ed. 2d 935, ***; 1974 U.S. LEXIS 91

written statement of reasons and a written record of the proceedings must be provided, while the Second and Third Circuits have held to the contrary, *Braxton v. Carlson, supra; Sostre v. McGinnis, supra.* Two Circuits have held that there is no right to present witnesses at a hearing, *Braxton v. Carlson, supra; Sostre v. McGinnis, supra,* while one has held that there must be an opportunity to *request* the calling of witnesses, *United States ex rel. Miller v. Twomey, supra.* Only the Ninth Circuit, *Clutchette v. Procunier, supra,* has held that there is the full power and right of an inmate to call witnesses. As to cross-examination, two Circuits have stated that due process does not require this procedure, *Braxton v. Carlson, supra; Sostre v. McGinnis, supra.* The First Circuit has held that where prison authorities had already extended the right to confront and cross-examine witnesses, there is no reason to force the authorities to call adverse witnesses when the inmate could have, *Palmigiano v. Baxter, 487 F.2d 1280 (1973).* Only the Ninth Circuit, *Clutchette v. Procunier, supra,* has held that there is a general right of cross-examination, but even that case holds that the right may be limited where there is a legitimate fear that retribution will result. As to counsel, two Circuits have held that there is no right even to lay substitutes, *Braxton v. Carlson, supra; Sostre v. McGinnis, supra,* while the Third Circuit, *Meyers v. Alldredge, supra,* has held that there is no right to counsel where counsel substitute is provided. The First Circuit, *Palmigiano v. Baxter, supra,* holds there is a right to retained counsel, even where a staff assistant is available, while the Ninth Circuit, *Clutchette v. Procunier, supra,* envisions some sanctions at disciplinary proceedings calling for provision of counsel, and has determined that counsel must be provided where a prison rule violation may be punishable by state law. An impartial hearing board has been required, to the extent that a member of the board may not participate in a case as an investigating or reviewing officer, or be a witness, *Clutchette v. Procunier, supra; Braxton v. Carlson, supra; United States ex rel. Miller v. Twomey, supra.* The Third Circuit, *Meyers v. Alldredge, supra,* has also held, in the context of the federal system where a prisoner whose good time is taken away goes first to a disciplinary committee and then to the Good Time Forfeiture Board, that an associate warden could not sit on both committees.

[*573] VI

[***961]

[***HR29] The Court of Appeals held that the due process requirements in prison [**2983] disciplinary proceedings were to apply retroactively so as to require that prison records containing determinations of misconduct, not in accord with required procedures, be expunged. We disagree and reverse on this point.

The question of retroactivity of new procedural rules

affecting inquiries into infractions of prison discipline is effectively foreclosed by this Court's ruling in *Morrissey* that the due process requirements there announced were to be "applicable to *future* revocations of parole," *408 U.S., at 490* (emphasis supplied). Despite the fact that procedures are related to the integrity of the factfinding [*574] process, in the context of disciplinary proceedings, where less is generally at stake for an individual than at a criminal trial, great weight should be given to the significant impact a retroactivity ruling would have on the administration of all prisons in the country, and the reliance prison officials placed, in good faith, on prior law not requiring such procedures. During 1973, the Federal Government alone conducted 19,000 misconduct hearings, as compared with 1,173 parole revocation hearings, and 2,023 probation revocation hearings. If *Morrissey-Scarpelli* rules are not retroactive out of consideration for the burden of federal and state officials, this case is *a fortiori.* We also note that a contrary holding would be very troublesome for the parole system since performance in prison is often a relevant criterion for parole. On the whole, we do not think that error was so pervasive in the system under the old procedures as to warrant this cost or result.

VII

The issue of the extent to which prison authorities can open and inspect incoming mail from attorneys to inmates, has been considerably narrowed in the course of this litigation. The prison regulation under challenge provided that "[all] incoming and outgoing mail will be read and inspected," and no exception [**2984] was made for attorney-prisoner mail. The District Court held that incoming mail from attorneys might be opened if normal contraband detection techniques failed to disclose contraband, and if there was a reasonable possibility that contraband would be included in the mail. It further held that if an incoming letter was marked "privileged," thus identifying it as from an attorney, the letter could not be opened except in the presence of the inmate. Prison authorities were not to read the mail from attorneys. The Court of Appeals affirmed the District Court order, [*575] but placed additional restrictions on prison authorities. If there was doubt that a letter was actually from an attorney, "a simple telephone call should be enough to settle the matter," *483 F.2d, at 1067,* the court thus implying that officials might have to go beyond the face of the envelope, and the "privileged" label, in ascertaining what kind of communication was [***962] involved. The court further stated that "the danger that a letter from an attorney, an officer of the court, will contain contraband is ordinarily too remote and too speculative to justify the [petitioners'] regulation permitting the opening and inspection of all legal mail." *Ibid.* While methods to detect contraband could be employed, a letter was to be opened only "in the appropriate circumstances" in the presence of the inmate.

Petitioners now concede that they cannot open and *read* mail from attorneys to inmates, but contend that they may open all letters from attorneys as long as it is done in the presence of the prisoners. The narrow issue thus presented is whether letters determined or found to be from attorneys may be opened by prison authorities in the presence of the inmate or whether such mail must be delivered unopened if normal detection techniques fail to indicate contraband.

[***HR30] [***HR31] Respondent asserts that his First, Sixth, and Fourteenth Amendment rights are infringed, under a procedure whereby the State may open mail from his attorney, even though in his presence and even though it may not be read. To begin with, the constitutional status of the rights asserted, as applied in this situation, is far from clear. While First Amendment rights of correspondents with prisoners may protect against the censoring of inmate mail, when not necessary to protect legitimate governmental interests, see *Procunier v. Martinez, 416 U.S. 396 (1974),* this Court has not yet recognized First [*576] Amendment rights of prisoners in this context, cf. *Cruz v. Beto, 405 U.S. 319 (1972); Cooper v. Pate, 378 U.S. 546 (1964).* Furthermore, freedom from censorship is not equivalent to freedom from inspection or perusal. As to the Sixth Amendment, its reach is only to protect the attorney-client relationship from intrusion in the criminal setting, see *Black v. United States, 385 U.S. 26 (1966); O'Brien v. United States, 386 U.S. 345 (1967);* see also *Coplon v. United States, 89 U. S. App. D. C. 103, 191 F.2d 749 (1951),* while the claim here would insulate all mail from inspection, whether related to civil or criminal matters. Finally, the Fourteenth Amendment due process claim based on access to the courts, *Ex parte Hull, 312 U.S. 546 (1941); Johnson v. Avery, 393 U.S. 483 (1969); Younger v. Gilmore, 404 U.S. 15 (1971),* has not been extended by this Court to apply further than protecting the ability of an inmate to prepare a petition or complaint. Moreover, even if one were to accept the argument that inspection of incoming mail from an attorney placed an obstacle to access to the court, it is far from clear that this burden is a substantial one. We need not decide, however, which, if any, of the asserted rights are operative here, for the question is whether, assuming some constitutional right is implicated, it is infringed by the procedure now found acceptable by the State.

[***HR32] [***HR33] [***HR34] [***HR35] In our view, the approach of the Court of Appeals is unworkable and none of the above rights is infringed by [**2985] the procedures petitioners now accept. If prison officials had to check in each case whether a communication was from an attorney before opening it for inspection, a near-impossible task of administration would be imposed. [***963] We think it entirely appropriate that the State require any such communications to be specially marked as originating from an attorney, with his name and address being given, if they are to receive special treatment. It would also certainly be permissible that prison authorities require [*577] that a lawyer desiring to correspond with a prisoner, *first* identify himself and his client to the prison officials, to assure that the letters marked privileged are actually from members of the bar. As to the ability to open the mail in the presence of inmates, this could in no way constitute censorship, since the mail would not be read. Neither could it chill such communications, since the inmate's presence insures that prison officials will not read the mail. The possibility that contraband will be enclosed in letters, even those from apparent attorneys, surely warrants prison officials' opening the letters. We disagree with the Court of Appeals that this should only be done in "appropriate circumstances." Since a flexible test, besides being unworkable, serves no arguable purpose in protecting any of the possible constitutional rights enumerated by respondent, we think that petitioners, by acceding to a rule whereby the inmate is present when mail

from attorneys is inspected, have done all, and perhaps even more, than the Constitution requires.

VIII

The last issue presented is whether the Complex must make available, and if so has made available, adequate legal assistance, under *Johnson v. Avery, supra,* for the preparation of habeas corpus petitions and civil rights actions by inmates. The issue arises in the context of a challenge to a regulation providing, in pertinent part:

*"Legal Work*

"A legal advisor has been appointed by the Warden for the benefit of those offenders who are in need of legal assistance. This individual is an offender who has general knowledge of the law procedure. He is not an attorney and can not represent you as such.

"No other offender than the legal advisor is permitted to assist you in the preparation of legal documents [*578] unless with the specific written permission of the Warden."

Respondent contended that this regulation was invalid because it failed to allow inmates to furnish assistance to one another. The District Court assumed that the Warden freely gave permission to inmates to give assistance to each other, and that *Johnson v. Avery, supra,* was thereby satisfied. The Court of Appeals found that the record did not support the assumption and that permission has been denied solely because of the existence of the inmate legal advisor, one of the inmates specially approved by the prison authorities. It decided, therefore, to remand the case to decide whether the one advisor satisfied the requirements of *Johnson v. Avery.* In so doing, the court stated that in determining the need for legal assistance, petitioners were to take into account the need for assistance in civil rights actions as well as habeas corpus suits.

In *Johnson* v. *Avery,* an inmate was disciplined for violating a prison regulation which prohibited inmates from assisting other prisoners in preparing habeas corpus petitions. The Court held that "unless and until the State provides some reasonable alternative to assist inmates in the preparation of petitions [***964] for post-conviction relief," inmates could not be barred from furnishing assistance to each other. *393 U.S., at 490.* The court emphasized that the writ of habeas corpus was of fundamental importance in our constitutional scheme, and since the basic purpose of the writ "is to enable those unlawfully incarcerated to obtain their freedom, it [**2986] is fundamental that access of prisoners to the courts for the purpose of presenting their complaints may not be denied or obstructed." *Id., at 485.* Following *Avery,* the Court, in *Younger v. Gilmore, supra,* affirmed a three-judge court judgment which required state officials to provide indigent [*579] inmates with access to a reasonably adequate law library for preparation of legal actions.

[***HR36] Petitioners contend

[***HR37A] that *Avery* is limited to assistance in the preparation of habeas corpus petitions and disputes the direction of the Court of Appeals to the District Court that the

418 U.S. 539, *; 94 S. Ct. 2963, **;
41 L. Ed. 2d 935, ***; 1974 U.S. LEXIS 91

capacity of the inmate adviser be assessed in light of the demand for assistance in civil rights actions as well as in the preparation of habeas petitions. Petitioners take too narrow a view of that decision.

[***HR38] First, the demarcation line between civil rights actions and habeas petitions is not always clear. The Court has already recognized instances where the same constitutional rights might be redressed under either form of relief. Cf. *Preiser v. Rodriguez*, 411 U.S. 475 (1973); *Haines v. Kerner*, 404 U.S. 519 (1972); *Wilwording v. Swenson*, 404 U.S. 249 (1971). Second, while it is true that only in habeas actions may relief be granted which will shorten the term of confinement, *Preiser, supra*, it is more pertinent that both actions serve to protect basic constitutional rights. The right of access to the courts, upon which *Avery* was premised, is founded in the Due Process Clause and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights. It is futile to contend that the Civil Rights Act of 1871 has less importance in our constitutional scheme than does the Great Writ. The recognition by this Court that prisoners have certain constitutional rights which can be protected by civil rights actions would be diluted if inmates, often "totally or functionally illiterate," were unable to articulate their complaints to the courts. Although there may be additional burdens on the Complex, if inmates may seek help from other inmates, or from the inmate adviser if he proves adequate, in both habeas and civil rights actions, this should not prove overwhelming. At [*580] present only one inmate serves as legal adviser and it may be expected that other qualified inmates could be found for assistance if the Complex insists on naming the inmates from whom help may be sought.

[***HR37B] Finding no reasonable distinction between the two forms of actions, we affirm the Court of Appeals on this point, and as the Court of Appeals suggested, the District Court will assess the adequacy of legal assistance under the reasonable-alternative standard of *Avery*.

*Affirmed in part, reversed in part, and remanded.*

CONCURBY:
    MARSHALL (In Part)

DISSENTBY:
    MARSHALL (In Part); DOUGLAS (In Part)

DISSENT:

[***965] MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, concurring in part and dissenting in part.

I join Part VII of the Court's opinion, holding that the Complex may not prohibit inmates from assisting one another in the preparation of legal documents unless it provides adequate alternative legal assistance for the preparation of civil rights actions as well as petitions for habeas corpus relief. I also agree with the result reached in Part VII of the opinion of the Court, upholding the inspection of mail from attorneys for contraband by opening letters in the presence of the inmate.

While I have previously expressed my view that the First Amendment rights of prisoners prohibit the reading of inmate mail, see *Procunier v. Martinez*, 416 U.S. 396, 422 (1973) (concurring opinion), and while I believe that inmates' rights to counsel and to access to the courts are also implicated here, I do not see how any of these constitutional rights are infringed to any significant extent by the mere inspection of mail in the presence of the inmate.

My disagreement with the majority is over its disposition of the primary issue [**2987] presented by this case, the extent of the procedural protections required by the Due Process Clause of the Fourteenth Amendment in prison disciplinary proceedings. I have previously stated my [*581] view that a prisoner does not shed his basic constitutional rights at the prison gate, and I fully support the Court's holding that the interest of inmates in freedom from imposition of serious discipline is a "liberty" entitled to due process protection. n1 But, in my view, the content which the Court gives to this due process protection leaves these noble holdings as little more than empty promises. To be sure, the Court holds that inmates are constitutionally entitled to advance written notice of the charges against them and a statement of the evidence relied on, the facts found, and the reasons supporting the disciplinary board's decision. Apparently, an inmate is also constitutionally entitled to a hearing and an opportunity to speak in his own defense. These are valuable procedural safeguards, and I do not mean for a moment to denigrate their importance.

n1 The Court defines the liberty interest at stake here in terms of the forfeiture of good time as a disciplinary measure. Since it is only loss of good time that is at issue in this case, this definition is of course quite appropriate here. But lest anyone be deceived by the narrowness of this definition, I think it important to note that this is obviously not the only liberty interest involved in prison disciplinary proceedings which is protected by due process. Indeed, the Court later observes that due process requires the same procedural protection when solitary confinement is at issue. *Ante*, at 571-572, n. 19. The Court apparently holds that inmates' "liberty" is protected by due process whenever "a major change in the conditions of confinement" is imposed as punishment for misconduct. *Ibid*. I agree. See *Palmigiano v. Baxter*, 487 F.2d 1280, 1284 (CA1 1973).

But the purpose of notice is to give the accused the opportunity to prepare a defense, and the purpose of a hearing is to afford him the chance to present that defense. Today's decision deprives an accused inmate of any enforceable constitutional right to the procedural tools essential to the presentation of any meaningful defense, and makes the required notice and hearing formalities of little utility. Without the [***966] enforceable right [*582] to call witnesses and present documentary evidence, an accused inmate is not guaranteed the right to present any defense beyond his own word. Without any right to confront and cross-examine adverse witnesses, the inmate is afforded no means to challenge the

word of his accusers. Without these procedures, a disciplinary board cannot resolve disputed factual issues in any rational or accurate way. The hearing will thus amount to little more than a swearing contest, with each side telling its version of the facts -- and, indeed, with only the prisoner's story subject to being tested by cross-examination. In such a contest, it seems obvious to me that even the wrongfully charged inmate will invariably be the loser. I see no justification for the Court's refusal to extend to prisoners these procedural safeguards which in every other context we have found to be among the "*minimum requirements of due process." Morrissey v. Brewer, 408 U.S. 471, 489 (1972)* (emphasis added).

The Court states that it is "of the opinion that the inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Ante*, at 566. Since the Court is not ordinarily in the business of giving neighborly advice to state correctional authorities, I think it fair to assume that this statement represents the considered judgment of the Court that the Constitution requires that an accused inmate be permitted to call defense witnesses and present documentary evidence. Still, the Court hardly makes this clear, and ends up deferring to the discretion of prison officials to the extent that the right recognized is, as my Brother DOUGLAS demonstrates, *post*, at 597-598, practically unenforceable.

[**2988] I would make clear that an accused inmate's right to present witnesses and submit other evidence in his [*583] defense is constitutionally protected and, if unnecessarily abridged, judicially enforceable. As we said only last Term: "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi, 410 U.S. 284, 302 (1973)*.

"The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the [hearing body] so it may decide where the truth lies." *Washington v. Texas, 388 U.S. 14, 19 (1967)*.

See also *Morrissey v. Brewer, supra, at 489; In re Oliver, 333 U.S. 257, 273 (1948)*. The right to present the testimony of impartial witnesses and real evidence to corroborate his version of the facts is particularly crucial to an accused inmate, who obviously faces a severe credibility problem when trying to disprove the charges of a prison guard. See *Clutchette v. Procunier, 497 F.2d 809, 818 (CA9 1974)*; ABA Commission on Correctional Facilities and Services, Survey of Prison Disciplinary Practices and Procedures 19 (1974) (hereinafter ABA Survey).

I see no persuasive reason to justify the Court's refusal to afford [***967] this basic right to an accused inmate. The majority cites the possible interference with "swift punishment." But how often do we have to reiterate that the Due Process Clause "recognizes higher values than speed and efficiency"? *Fuentes v. Shevin, 407 U.S. 67, 90-91, n. 22 (1972)*. Surely the brief prolongation of disciplinary hearings required to hear the testimony of a few witnesses before reaching what would otherwise seem to be a pre-ordained

decision provides no support whatever for refusal to give accused inmates this right. Nor do I see the "obvious potential for disruption" that [*584] the majority relies upon in the context of an inmate's right to call *defense* witnesses.

But even if the majority's fear in this regard is justified, the point that must be made clear is that the accused prisoner's right to present witnesses is the constitutional rule and that the needs of prison security must be accommodated within a narrowly limited exception to that rule. The inmate's right to call witnesses should, of course, be subject to reasonable limitation by the disciplinary board to prevent undue delay caused by an inmate's calling numerous cumulative witnesses or witnesses whose contributions would be of marginal relevance. The right to call a particular witness could also justifiably be limited if necessary to protect a confidential informant against a substantial risk of reprisal. I agree with the Court that there is this much flexibility in the due process requirement. But in my view the exceptions made to the constitutional rule must be kept to an absolute minimum, and each refusal to permit witnesses justified in writing in the disciplinary file, a rule the majority finds "useful" but inexplicably refuses to prescribe. *Ante*, at 566. And if prison authorities persist in a niggardly interpretation of the inmates' right to call witnesses, it must ultimately be up to the courts to exercise their great responsibility under our constitutional plan and enforce this fundamental constitutional right.

With respect to the rights of confrontation and cross-examination, the gulf between the majority opinion and my views is much wider. In part, this disagreement appears to stem from the majority's view that these rights are just not all that important. Thus, the Court states -- not surprisingly, without citation of authority, other than MR. JUSTICE WHITE's separate opinion in *Arnett v. Kennedy, 416 U.S. 134, 171 (1974)* -- that confrontation and cross-examination "are [**2989] not rights universally [*585] applicable to all hearings." *Ante*, at 567. And the Court suggests that while these procedures may be essential in situations where "serious deprivations" like loss of employment are at stake, they are not so essential here. I suppose the majority considers loss of a job to be a more serious penalty than the imposition of an additional prison sentence -- on this record, ranging up to 18 months -- which is the effective result of withdrawal of accumulated good time.

I could not disagree more, both with respect to the seriousness of the deprivation involved here and the importance of these rights. Our decisions flatly reject the Court's view of the dispensability of confrontation and cross-examination. We have held that "[in] almost every setting where important decisions [***968] turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg v. Kelly, 397 U.S. 254, 269 (1970)*. And in *Greene v. McElroy, 360 U.S. 474, 496 (1959)*, we found that the view that cross-examination and confrontation must be permitted whenever "governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings" was one of the "immutable" principles of our jurisprudence -- immutable, that is, until today. See also *Arnett v. Kennedy, supra, at 215* (MARSHALL, J., dissenting); *Chambers v. Mississippi, supra, at 294-295; Morrissey v. Brewer, 408 U.S., at 489; In re Gault, 387 U.S. 1, 56-57*

418 U.S. 539, *; 94 S. Ct. 2963, **;
41 L. Ed. 2d 935, ***; 1974 U.S. LEXIS 91

*(1967).* Surely confrontation and cross-examination are as crucial in the prison disciplinary context as in any other, if not more so. Prison disciplinary proceedings will invariably turn on disputed questions of fact, see *Landman v. Royster, 333 F.Supp. 621, 653 (ED Va. 1971),* and, in addition to the usual need for cross-examination to reveal mistakes of identity, faulty perceptions, or cloudy memories, there is a significant potential **[\*586]** for abuse of the disciplinary process by "persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy," *Greene v. McElroy, supra, at 496,* whether these be other inmates seeking revenge or prison guards seeking to vindicate their otherwise absolute power over the men under their control. See also *Davis v. Alaska, 415 U.S. 308, 317 (1974).* I can see no rational means for resolving these disputed questions of fact without providing confrontation and cross-examination.

The majority, however, denies accused prisoners these basic constitutional rights, and leaves these matters for now to the "sound discretion" of prison officials. Since we already know how Nebraska authorities, at least, have chosen to exercise this discretion, the Court necessarily puts its stamp of approval on the State's failure to provide confrontation and cross-examination. I see no persuasive justification for this result. The Court again cites concern for administrative efficiency in support of its holding: "Proceedings would inevitably be longer and tend to unmanageability." *Ante, at 567.* I can only assume that these are makeweights, for I refuse to believe that the Court would deny fundamental rights in reliance on such trivial and easily handled concerns.

A more substantial problem with permitting the accused inmate to demand confrontation with adverse witnesses is the need to preserve the secrecy of the identity of inmate informers and protect them from the danger of reprisal. I am well aware of the seriousness of this problem, and I agree that in some circumstances this confidentiality must prevail over the accused's right of confrontation. "But this concern for the safety of inmates does not justify a wholesale denial of the right to confront and cross-examine adverse witnesses." **[\*\*2990]** *Clutchette v. Procunier, 497 F.2d, at 819.* The need to keep the identity of informants confidential will exist in only **[\*587]** a small percentage of disciplinary cases. Whether because of the "inmates' code" or otherwise, the disciplinary **[\*\*\*969]** process is rarely initiated by a fellow inmate and almost invariably by a correctional officer. I see no legitimate need to keep confidential the identity of a prison guard who files charges against an inmate; indeed, Nebraska, like most States, routinely informs accused prisoners of the identity of the correctional officer who is the charging party, if he does not already know. In the relatively few instances where inmates press disciplinary charges, the accused inmate often knows the identity of his accuser, as, for example, where the accuser was the victim of a physical assault.

Thus, the Court refuses to enforce prisoners' fundamental procedural rights because of a legitimate concern for secrecy which must affect only a tiny fraction of disciplinary cases. This is surely permitting the tail to wag the constitutional dog. When faced with a similar problem in *Morrissey v. Brewer, supra,* we nonetheless held that the parolee had the constitutional right to confront and cross-examine adverse witnesses, and permitted an exception to be made "if the

hearing officer determines that an informant would be subjected to risk of harm if his identity were disclosed." *408 U.S., at 487.* In my view, the same approach would be appropriate here.

Aside from the problem of preserving the confidentiality of inmate informers, the Court does not require confrontation and cross-examination of known accusers, whether inmates or guards, and indeed does not even require cross-examination of adverse witnesses who actually testify at the hearing. Yet, as THE CHIEF JUSTICE recently observed, "[cross-examination] is the principal means by which the believability of a witness and the truth of his testimony are tested," *Davis v. Alaska, supra, at 316,* and "'[the] main and essential purpose of confrontation **[\*588]** is to secure for the opponent the opportunity of cross-examination.'" *Id., at 315-316.* I see little basis for the Court's refusal to recognize the accused inmate's rights in these circumstances. The Court apparently accepts petitioners' arguments that there is a danger that such cross-examination will produce hostility between inmate and guard, or inmate and inmate, which will eventually lead to prison disruption; or that cross-examination of a guard by an inmate would threaten the guard's traditional role of absolute authority; or that cross-examination would somehow weaken the disciplinary process as a vehicle for rehabilitation.

I do not believe that these generalized, speculative, and unsupported theories provide anything close to an adequate basis for denying the accused inmate the right to cross-examine his accusers. The State's arguments immediately lose most of their potential force when it is observed that Nebraska already permits inmates to question the correctional officer who is the charging party with respect to the charges. See *ante,* at 567 n. 17. Moreover, by far the greater weight of correctional authority is that greater procedural fairness in disciplinary proceedings, including permitting confrontation and cross-examination, would enhance rather than impair the disciplinary process as a rehabilitative tool. President's Commission on Law Enforcement and the Administration of Justice, Task Force Report: Corrections 13, 82-83 (1967); ABA Survey 20-22; **[\*\*\*970]** see *Landman v. Royster, 333 F.Supp., at 653.*

"Time has proved ... that blind deference to correctional officials does no real service to them. Judicial concern with procedural regularity has a direct bearing upon the maintenance of institutional order; the orderly care with which decisions are made by the prison authority is intimately related to the level of respect with which prisoners regard **[\*\*2991]** that authority. **[\*589]** There is nothing more corrosive to the fabric of a public institution such as a prison than a feeling among those whom it contains that they are being treated unfairly." *Palmigiano v. Baxter, 487 F.2d 1280, 1283 (CA1 1973).*

As THE CHIEF JUSTICE noted in *Morrissey v. Brewer, 408 U.S., at 484,* "fair treatment ... will enhance the chance of rehabilitation by avoiding reactions to arbitrariness."

Significantly, a substantial majority of the States do permit confrontation and cross-examination in prison disciplinary proceedings, and their experience simply does not bear out the speculative fears of Nebraska authorities. See ABA Survey 21-22. The vast majority of these States have observed "no noticeable effect on prison security or safety. Furthermore, there was general agreement that the quality of the hearings had

been 'upgraded' and that some of the inmate feelings of powerlessness and frustration had been relieved." *Id.*, at 21. The only reported complaints have been, not the theoretical problems suggested by petitioners, but that these procedures are time consuming and have slowed down the disciplinary process to some extent. These are small costs to bear to achieve significant gains in procedural fairness.

Thus, in my view, we should recognize that the accused prisoner has a constitutional right to confront and cross-examine adverse witnesses, subject to a limited exception when necessary to protect the identity of a confidential inmate informant. This does not mean that I would not permit the disciplinary board to rely on written reports concerning the charges against a prisoner. Rather, I would think this constitutional right sufficiently protected if the accused had the power to compel the attendance of an adverse witness so that his story can be tested by cross-examination. See *Clutchette v. Procunier*, [*590] *497 F.2d, at 819; Palmigiano v. Baxter, supra, at 1290.* Again, whenever the right to confront an adverse witness is denied an accused, I would require that this denial and the reasons for it be noted in writing in the record of the proceeding. I would also hold that where it is found necessary to restrict the inmate's right of confrontation, the disciplinary board has the constitutional obligation to call the witness before it *in camera* and itself probe his credibility, rather than accepting the unchallenged and otherwise unchallengeable word of the informer. See *ibid.*; cf. *Birzon v. King, 469 F.2d 1241 (CA2 1972).* And, again, I would make it clear that the unwarranted denial of the right to confront adverse witnesses, after giving due deference to the judgment of prison officials and their reasonable concerns with inmate safety and institutional order, would be cause for judicial intervention.

The Court next turns to the question of an accused inmate's right [***971] to counsel, and quotes a long passage from our decision last Term in *Gagnon v. Scarpelli, 411 U.S. 778 (1973)*, in support of its conclusion that appointed counsel need not be provided and retained counsel need not be permitted in prison disciplinary proceedings at this time. The Court seemingly forgets that the holding of *Scarpelli* was that fundamental fairness requires the appointment of counsel in some probation revocation or parole revocation proceedings and overlooks its conclusion that

"the effectiveness of the rights guaranteed by *Morrissey* may in some circumstances depend on the use of skills which the probationer or parolee is unlikely to possess. Despite the informal nature of the proceedings and the absence of technical rules of procedure or evidence, the unskilled or uneducated probationer or parolee may well have difficulty in [*591] presenting his version of a disputed set of facts where the presentation requires the examining or cross-examining of witnesses or the offering or dissecting of complex [**2992] documentary evidence." *Id., at 786-787.*

Plainly, these observations are at least as appropriate in the context of prison disciplinary proceedings. We noted in *Johnson v. Avery, 393 U.S. 483, 487 (1969),* that "penitentiaries include among their inmates a high percentage of persons who are totally or functionally illiterate, whose

educational attainments are slight, and whose intelligence is limited"; the same considerations provide the motivating force for the holding today in Part VIII of the Court's opinion.

In view of these considerations, I think it is clear that, at least in those serious disciplinary cases meeting the *Scarpelli* requirements, see *411 U.S., at 790,* any inmate who seeks assistance in the preparation of his defense must be constitutionally entitled to have it. But, although for me the question is fraught with great difficulty, I agree with the Court that it would be inappropriate at this time to hold that this assistance must be provided by an appointed member of the bar. n2 There is considerable force to the argument that counsel on either side would be out of place in these disciplinary proceedings, and the practical problems of providing appointed counsel in these proceedings may well be insurmountable. But [*592] the controlling consideration for me is my belief that, in light of the types of questions likely to arise in prison discipline cases, counsel substitutes should be able to provide sufficiently effective assistance to satisfy due process. At least 41 States already provide such counsel substitutes, ABA Survey 22, reflecting the nearly universal recognition that for most inmates, this assistance with the preparation of a defense, [***972] particularly as disciplinary hearings become more complex, is absolutely essential. Thus, I would hold that any prisoner is constitutionally entitled to the assistance of a competent fellow inmate or correctional staff member -- or, if the institution chooses, such other alternatives as the assistance of law students -- to aid in the preparation of his defense.

n2 On the record in this case, no question is presented with respect to the presence of retained counsel at prison disciplinary proceedings, and I think it inappropriate for the Court to reach out and decide this important issue without the benefit of a concrete factual situation in which the issue arises. I would reserve for another day the questions whether the Constitution requires that an inmate able to afford counsel be permitted to bring counsel into the disciplinary hearing, or whether the Constitution allows a State to permit the presence of retained counsel when counsel is not appointed for indigents. Cf. *Gagnon v. Scarpelli, 411 U.S. 778, 783 n. 6 (1973).*

Finally, the Court addresses the question of the need for an impartial tribunal to hear these prison disciplinary cases. We have recognized that an impartial decisionmaker is a fundamental requirement of due process in a variety of relevant situations, see, e. g., *Morrissey v. Brewer, 408 U.S., at 485-486; Goldberg v. Kelly, 397 U.S., at 271,* and I would hold this requirement fully applicable here. But in my view there is no constitutional impediment to a disciplinary board composed of responsible prison officials like those on the Adjustment Committee here. While it might well be desirable to have persons from outside the prison system sitting on disciplinary panels, so as to eliminate any possibility that subtle institutional pressures may affect the outcome of disciplinary cases and to avoid any appearance of unfairness, in my view due process is

satisfied as long as no member of the disciplinary board has been involved in the investigation or prosecution of the particular case, or has had any other form of personal involvement in the case. See *Clutchette v. Procunier, 497 F.2d, at 820; United States ex rel. Miller v. Twomey, 479 F.2d 701,* [*593] *716, 718 (CA7 1973); Landman v. Royster, 333 F.Supp., at 653.* I find it impossible to determine on the present record whether this standard of impartiality has been [**2993] met, and I would leave this question open for the District Court's consideration on remand.

Thus, it is my conclusion that the Court of Appeals was substantially correct in its holding that the minimum due process procedural requirements of *Morrissey v. Brewer* are applicable in the context of prison disciplinary proceedings. To the extent that the Court is willing to tolerate reduced procedural safeguards for accused inmates facing serious punishment which do not meet the standards set out in this opinion, I respectfully dissent.

MR. JUSTICE DOUGLAS, dissenting in part, concurring in the result in part.

The majority concedes that prisoners are persons within the meaning of the Fourteenth Amendment, requiring the application of certain due process safeguards to prison disciplinary proceedings, if those proceedings have the potential of resulting in the prisoner's loss of good time or placement in solitary confinement, *ante,* at 571-572, n. 19. But the majority finds that prisoners can be denied the right to cross-examine adverse witnesses against them, and sustains the disciplinary board's right to rely on secret evidence provided by secret accusers in reaching its decision, on the ground that only the prison administration can decide whether in a particular case the danger of retribution requires shielding a particular witness' identity. And in further deference to prison officials, the majority, while holding that the prisoner must usually be accorded the right to present witnesses on his own behalf, appears to leave the prisoner no remedy against a prison board which unduly restricts that right in the name of "institutional safety." Respondent [*594] [***973] thus receives the benefit of some of the constitutional rights of due process that the Fourteenth Amendment extends to all "persons." In my view, however, the threat of any substantial deprivation of liberty within the prison confines, such as solitary confinement, is a loss which can be imposed upon respondent prisoner and his class only after a full hearing with all due process safeguards.

I

I agree that solitary confinement is a deprivation requiring a due process hearing for its imposition. Due process rights are required whenever an individual risks condemnation to a "grievous loss," *Morrissey v. Brewer, 408 U.S. 471, 481; Goldberg v. Kelly, 397 U.S. 254, 263; Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 168* (Frankfurter, J., concurring). Thus due process is required before the termination of welfare benefits, *Goldberg, supra;* revocation of parole or probation, *Morrissey, supra,* and *Gagnon v. Scarpelli, 411 U.S. 778;* revocation of a driver's license, *Bell v. Burson, 402 U.S. 535;* and attachment of wages, *Sniadach v. Family Finance Corp., 395 U.S. 337.* Every prisoner's liberty is, of course, circumscribed by the very fact of his confinement, but

his interest in the limited liberty left to him is then only the more substantial. Conviction of a crime does not render one a nonperson whose rights are subject to the whim of the prison administration, and therefore the imposition of any serious punishment within the prison system requires procedural safeguards. Of course, a hearing need not be held before a prisoner is subjected to some minor deprivation, such as an evening's loss of television privileges. Placement in solitary confinement, however, is not in that category. Prisoners are sometimes placed in solitary or punitive segregation for months or even years. *Bryant v. Harris, 465 F.2d 365; Sostre v. McGinnis, 442 F.2d 178; Adams* [*595] *v. Carlson, 368 F.Supp. 1050; Landman v. Royster, 333 F.Supp. 621,* and such confinement inevitably results in depriving the prisoner of other privileges as well as those which are ordinarily available to the general prison population, *LaReau v.* [**2994] *MacDougall, 473 F.2d 974; Wright v. McMann, 387 F.2d 519.* Moreover, the notation in a prisoner's file that he has been placed in such punitive confinement may have a seriously adverse effect on his eligibility for parole, a risk which emphasizes the need for prior due process safeguards, *Clutchette v. Procunier, 497 F.2d 809.*

II

I would start with the presumption that cross-examination of adverse witnesses and confrontation of one's accusers are essential rights which ought always to be available absent any special overriding considerations. In *Morrissey v. Brewer, supra,* we held that the right to confront and cross-examine adverse witnesses is a minimum requirement of due process which must be accorded parolees facing revocation of their parole "unless the hearing officer specifically finds good cause for not allowing confrontation." *408 U.S., at 489.* "Because most disciplinary cases will turn on issues of fact ... the [***974] right to confront and cross-examine witnesses is essential." *Landman v. Royster, supra, at 653.*

"Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where [*596] the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination. ... This Court has been zealous to protect these rights from erosion. It has spoken out not only in criminal cases ... but also in all types of cases where administrative and regulatory actions were under scrutiny." *Greene v. McElroy, 360 U.S. 474, 496-497.*

The decision as to whether an inmate should be allowed to confront his accusers should not be left to the unchecked and unreviewable discretion of the prison disciplinary board. The argument offered for that result is that the danger of violent response by the inmate against his accusers is great, and that only the prison administrators are in a position to weigh the necessity of secrecy in each case. But it is precisely this unchecked power of prison administrators which is the problem

418 U.S. 539, *; 94 S. Ct. 2963, **;
41 L. Ed. 2d 935, ***; 1974 U.S. LEXIS 91

that due process safeguards are required to cure. "Not only the principle of judicial review, but the whole scheme of American government, reflects an institutionalized mistrust of any such unchecked and unbalanced power over essential liberties. That mistrust does not depend on an assumption of inveterate venality or incompetence on the part of men in power ...." *Covington v. Harris, 136 U. S. App. D. C. 35, 39, 419 F.2d 617, 621.* Likewise the prisoner should have the right to cross-examine adverse witnesses who testify at the hearing. Opposed is the view that the right may somehow undermine the proper administration of the prison, especially if accused inmates are allowed to put questions to their guards. That, however, is a view of prison administration [*597] which is outmoded and indeed anti-rehabilitative, for it supports the prevailing pattern of hostility between inmate and personnel which generates an "inmates' code" of noncooperation, thereby preventing the rapport necessary for a successful rehabilitative program. The goal is to reintegrate inmates into a society where men are supposed to be treated fairly by the government, not arbitrarily. The opposed procedure will be counterproductive. A report prepared for the Joint Commission on Correctional Manpower and Training has pointed out that the [**2995] "basic hurdle [to reintegration] is the concept of a prisoner as a nonperson and the jailer as an absolute monarch. The legal strategy to surmount this hurdle is to adopt rules ... maximizing the prisoner's freedom, dignity, and responsibility. More particularly, the law must respond to the substantive and procedural claims that prisoners may have ...." F. Cohen, The Legal Challenge to Corrections 65 (1969). [***975] We recognized this truth in *Morrissey,* where we noted that society has an interest in treating the parolee fairly in part because "fair treatment in parole revocations will enhance the chance of rehabilitation by avoiding reactions to arbitrariness." *408 U.S., at 484.* The same principle applies to inmates as well.

The majority also holds that "the inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Ante,* at 566. Yet, while conceding that "the right to present evidence is basic to a fair hearing," *ibid.,* the Court again chooses to leave the matter to the discretion of prison officials, who are not even required to state their reasons for refusing a prisoner his right to call a witness, although the Court finds that such a statement of reasons would be [*598] "useful." *Ibid.* Thus, although the Court acknowledges the prisoner's right, it appears to leave him with no means of enforcing it.

As the Court itself agrees in holding that the disciplinary board must provide a statement of reasons for its ultimate determination on the merits, *ante,* at 564-565, such a written statement is crucial not only to provide a basis for review, but to ensure that the board "will act fairly." *Ante,* at 565. Of course even in a criminal trial the right to present one's own witnesses may be limited by the trial judge's finding that the evidence offered is irrelevant, incompetent, or needlessly repetitious, and certainly the same restrictions may apply in the prison setting. But when the judge makes such a ruling it is a matter in the record which may be challenged on appeal. Nebraska may not provide any channel for administrative appeal of the board's ruling, but because "'[the] fundamental requisite of due process of law is the opportunity to be heard,'"

*Goldberg v. Kelly, 397 U.S. 254, 267,* some possibility must remain open for judicial oversight. Here as with the rights of confrontation and cross-examination, I must dissent from the Court's holding that the prisoner's exercise of a fundamental constitutional right should be left within the unreviewable discretion of prison authorities.

Our prisons are just now beginning to work their way out of their punitive heritage. The first American penitentiary was established in Philadelphia in 1790; it contained 24 individual cells for the solitary confinement of hardened offenders. P. Tappan, Crime, Justice and Correction 605-606 (1960). Under this "Pennsylvania System" the prisoner was continuously confined to solitary and all communication was forbidden, with the exception of religious advisors and official visitors. M. Wilson, The Crime of Punishment 219-220 (1931). New [*599] York experimented with this approach but found it too severe, and adopted instead a compromise solution known as the "Auburn" or "silent" system, in which inmates were allowed to work in shops with others during the day, although under a strict rule of silence, and then returned to solitary confinement at night. Prisoners were marched around in military lock-step with their eyes cast on the ground, and the violations of any rules resulted in the immediate infliction of corporal punishment by the guards. [***976] Tappan, *supra,* at 609-610. Although the harsh treatment produced an orderly prison, it came under criticism because of its inhumanity, with particular emphasis on the unfettered discretion of the guards to impose punishment on the basis of [**2996] vague charges that were never subjected to detached or impartial evaluation. Introductory Report to the Code of Reform and Prison Discipline 8, printed in E. Livingston, A System of Penal Law for the United States (1828).

We have made progress since then but the old tradition still lingers. Just recently an entire prison system of one State was held so inhumane as to be a violation of the Eighth Amendment bar on cruel and unusual punishment. *Holt v. Sarver, 309 F.Supp. 362,* aff'd, *442 F.2d 304.* The lesson to be learned is that courts cannot blithely defer to the supposed expertise of prison officials when it comes to the constitutional rights of inmates.

"Prisoners often have their privileges revoked, are denied the right of access to counsel, sit in solitary or maximum security or lose accrued 'good time' on the basis of a single, unreviewed report of a guard. When the courts defer to administrative discretion, it is this guard to whom they delegate the final word on reasonable prison practices. This is the central evil in prison ... the unreviewed administrative [*600] discretion granted to the poorly trained personnel who deal directly with prisoners." Hirschkop & Millemann, The Unconstitutionality of Prison Life, *55 Va. L. Rev. 795, 811-812 (1969).*

The prisoner's constitutional right of confrontation should not yield to the so-called expertise of prison officials more than is necessary. The concerns of prison officials in maintaining the security of the prison and of protecting the safety of those offering evidence in prison proceedings are real and important. But the solution cannot be a wholesale abrogation of the fundamental constitutional right to confront one's accusers. The danger of retribution against the informer is not peculiar to the prison system; it exists in every adversary proceeding, and the

418 U.S. 539, *; 94 S. Ct. 2963, **;
41 L. Ed. 2d 935, ***; 1974 U.S. LEXIS 91

criminal defendant out on bail during his trial might present a greater threat to the witness hostile to his interests than the prison inmate who is subject to constant surveillance. See *Preiser v. Rodriguez, 411 U.S. 475, 492.* If there is an "inmates' code" of the prison, resulting from hostility to the authorities, which proscribes inmate cooperation with prison officials in disciplinary proceedings, it is probably based upon the perceived arbitrariness of those proceedings. That ethic, which is clearly anti-rehabilitative, must be ferreted out, but I do not see how the petitioners can rely on their current failure to correct this evil for the perpetration of an additional one -- the denial of the right of confrontation. In some circumstances it may be that an informer's identity should be shielded. Yet in criminal trials the rule has been that if the informer's information is crucial to the defense, then the government must choose between revealing his identity and allowing confrontation, or dismissing the charges. *Roviaro v. United States, 353 U.S. 53.* And it is the court, not the prosecutor, who determines the defendant's need for the information. We **[*601]** should no more place the inmate's constitutional rights in the hands of the **[***977]** prison administration's discretion than we should place the defendant's right in the hands of the prosecutor.

Insofar as the Court affirms the judgment of the Court of Appeals I concur in the result. But the command of the Due Process Clause of the Fourteenth Amendment compels me to dissent from that part of the judgment allowing prisoners to continue to be deprived of the right to confront and cross-examine their accusers, and leaving the right to present witnesses in their own behalf in the unreviewable discretion of prison officials.

III

Finally, the Court again, as earlier this term in *Procunier v. Martinez, 416 U.S. 396,* sidesteps the issue of the First Amendment rights of prisoners to send and receive mail. I adhere to the views expressed by my Brother MARSHALL and **[**2997]** myself earlier this Term in our separate opinions in *Procunier.* I agree, however, with the Court that the prisoners' First Amendment rights are not violated by inspection of their mail for contraband, so long as the mail is not read and the inspection is done in the prisoner's presence so that he can be assured that the privacy of his communications is not breached. Such a procedure should adequately serve the prison administration's interest in ensuring that weapons, drugs, and other prohibited materials are not unlawfully introduced into the prison, while preserving the prisoner's First Amendment right to communicate with others through the mail.